08-2521-cv
*AXA Versicherung AG v. American International Group Inc.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 23rd day of August, two thousand and ten.

PRESENT:
>
> CHESTER J. STRAUB,
> PETER W. HALL,
> DEBRA ANN LIVINGSTON,
> *Circuit Judges*.

───────────────────────────────────────────

AXA VERSICHERUNG AG, ON ITS OWN BEHALF
AND AS SUCCESSOR IN INTEREST TO
ALBINGIA VERSICHERUNGS AG,

> *Plaintiff-Counter-Defendant-Appellee*,

v.             No. 08-2521-cv

NEW HAMPSHIRE INSURANCE COMPANY, AMERICAN HOME
ASSURANCE COMPANY AND NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA,

> *Defendants-Counter-Claimants-Appellants*,

AMERICAN INTERNATIONAL GROUP, INC. AND
AMERICAN INTERNATIONAL UNDERWRITERS OVERSEAS, LTD.,

> *Defendants*.

───────────────────────────────────────────

1

JOSEPH T. MCCULLOUGH IV (Paul Bradford Ockene, Joseph P. Cyr, Sean Thomas Keely, *on the brief*) Hogan Lovells US LLP, Chicago, IL and New York, NY, *for Plaintiff-Counter-Defendant-Appellee*.

KATHLEEN M. SULLIVAN (William B. Adams, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY; Stuart E. Cotton, David W. Kenna, Mound Cotton Wollan & Greengrass, New York, NY, *on the brief*), Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, *for Defendants-Counter-Claimants-Appellants*.

_____

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the District Court is AFFIRMED IN PART and VACATED IN PART, and the case is REMANDED to the District Court for entry of judgment in favor of Defendants-Counter-Claimants-Appellants.

_____

Defendants-Appellants New Hampshire Insurance Company, American Home Assurance Company, and National Union Fire Insurance Company of Pittsburgh, Pennsylvania (collectively, "AIG") appeal from a judgment entered in the Southern District of New York (Jed S. Rakoff, *Judge*) after a jury trial holding AIG liable for $34,373,170, including $5,750,000 in punitive damages, on claims of fraudulent inducement with respect to two reinsurance facilities, and from the denial of AIG's post-trial motions for relief under Federal Rules of Civil Procedure 50(b) and 59(e). This matter has returned to us after our summary order remand to the District Court on October 6, 2009. *See AXA Versicherung AG v. N.H. Ins. Co.*, 348 F. App'x 628 (2d Cir. 2009). Pursuant to that remand order, we requested that the District Court address in the first instance whether the allegations of Plaintiff-Appellee AXA Versicherung AG ("AXA"), the successor in interest to Albingia Versicherungs AG ("Albingia"),[1] sound in contract as opposed to fraud and whether AIG waived any right it might have to arbitration. *Id.* at 630-31. The

_____

[1] For ease of reference, unless otherwise noted, we refer only to AXA even though many of the relevant negotiations were between AIG and Albingia.

2

District Court gave full consideration to these issues, and issued its decision on April 29, 2010.
*See AXA Versicherung AG v. N.H. Ins. Co.*, --- F. Supp. 2d ----, No. 05 Civ. 10180, 2010 WL
1718202 (S.D.N.Y. Apr. 29, 2010).

We now consider, first, whether the District Court correctly concluded that AXA's
allegations sound in fraud, and thus were properly before the District Court rather than being
arbitrable, and, second, the remaining issues presented by this appeal, including whether AXA's
claims are barred by the statute of limitations. We assume the parties' familiarity with the facts,
procedural history, and scope of the issues presented on appeal. For the reasons that follow, we
affirm the District Court's conclusion in its April 29 opinion that all of AXA's allegations sound
in fraud, and thus were not arbitrable, but we vacate the judgment holding AIG liable for
$34,373,170 because AXA's fraudulent inducement claims are barred by the statute of
limitations. Accordingly, we remand for entry of judgment in favor of AIG.

As a threshold matter, we agree with the District Court that AXA's allegations sound in
fraud. *See AXA Versicherung*, 2010 WL 1718202, at \*4-6.[2] Specifically, the challenged factual
allegations all constitute misrepresentations "of present fact, not of future intent[,] collateral to,
but which w[ere] the inducement for the contract." *Deerfield Commc'ns Corp. v. Chesebrough-
Ponds, Inc.*, 502 N.E.2d 1003, 1004 (N.Y. 1986) (internal quotation marks and citation omitted).
Stated differently, this is *not* a case where AXA makes "general allegations that [AIG] entered
into [the reinsurance] contract[s] while lacking the intent to perform," which would be
"insufficient to support [a fraud] claim." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir.
2006) (fourth alteration in original) (internal quotation marks omitted); *cf. TVT Records v. Island*

---

[2] For a succinct summary of the allegations that comprise AXA's fraudulent inducement
claims that went to trial, see *AXA Versicherung*, 2010 WL 1718202, at \*2-3.

*Def Jam Music Group*, 412 F.3d 82, 92 (2d Cir. 2005) (noting that a claim sounding in fraud may be established where the issue is not a lack of "inten[tion] to perform the contract," particularly because the seller did perform, but the issue instead is that the "seller concealed a material defect in the product it sold"). To the contrary, AIG fully performed under the reinsurance contracts by ceding certain risks to the two reinsurance facilities, paying corresponding premiums to AXA, and seeking payment from AXA for its share of reported losses on those ceded risks.

AIG intended to, and did, perform under the reinsurance contracts, but it misrepresented to AXA the "present fact" of precisely how the reinsurance facilities would operate from their inception, *i.e.*, AIG misrepresented that it would treat the facilities as facultative obligatory, that it would cede a reasonable cross-section of risks (which a facultative obligatory contract implicitly requires), and that AXA's share of the primary layer risks would be calculated as a percentage of AIG's share of the risks when, in fact, AIG did not intend to retain any primary layer risks. These alleged misrepresentations were essential to induce AXA to enter into the reinsurance contracts because, as AXA alleged, it would not (in fact, could not) have entered into a purely facultative reinsurance contract, under which AIG could try to unload risks it perceived as less profitable that AXA could either accept or reject in re-underwriting those risks, and AXA would not have agreed to a contract where AIG retained no primary layer risks. Moreover, that AIG's alleged misrepresentations were "collateral to" the reinsurance contracts is supported by the absence of any language in the initial slips related to these factual allegations. Accordingly, because we agree with the District Court that all of AXA's allegations sound in fraud, there is no need to reach the issue of whether, even if certain of the allegations sounded in contract, AIG

4

waived arbitration.

This brings us to the statute of limitations issue. We conclude that AXA's fraudulent inducement claims (a single claim for each reinsurance facility) are time-barred. The District Court rejected AIG's motion for summary judgment on this point, concluding that the issue turned on disputed questions of fact. And at trial, the jury found that with respect to each facility AXA proved that it did not discover, and could not with reasonable diligence have discovered, until after December 2, 2003, the facts from which a reasonable reinsurer in AXA's position would have inferred that it was fraudulently induced to enter into the facilities. After trial, the District Court again rejected AIG's statute of limitations defense, denying its renewed Rule 50(b) motion and holding that "the jury had a more than sufficient evidentiary basis upon which to conclude that a 'reasonable reinsurer in AXA's position' would not have been put on notice that it had been defrauded until" 2005. *AXA Versicherung AG v. N.H. Ins. Co.*, No. 05 Civ. 10180, 2008 WL 1849312, at *4 (S.D.N.Y. Apr. 22, 2008). We review this decision *de novo*, while viewing the facts in the light most favorable to AXA and applying the same deference to the jury's verdict and credibility findings as the District Court. *See Fid. & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*, 540 F.3d 133, 136, 142 (2d Cir. 2008); *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004).

> Under New York law, a claim for fraud must be commenced either within six years from the commission of the fraud or within two years from the date that the fraud was discovered, or could reasonably have been discovered, whichever is later. The plaintiff bears the burden of establishing that the fraud could not have been discovered before the two-year period prior to the commencement of the action. Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.

5

*Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007) (footnote, citations, brackets, and internal quotation marks omitted). AXA filed suit on December 2, 2005, and no party claims this was "within six years from the commission of the fraud," nor that AXA had actual notice before 2005. Thus, the issue is whether the evidence supports the jury's finding that AXA was not on inquiry notice until after December 2, 2003. We have stated:

> Whether a plaintiff was placed on inquiry notice is analyzed under an objective standard. This objective determination can be resolved as a matter of law — it need not be made by a trier of fact.
>
> "Storm warnings" need not detail every aspect of the alleged fraudulent scheme: An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice. Rather, a totality-of-the-circumstances analysis applies. Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct.

*Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) (citations and internal quotation marks omitted).[3]

The crux of AXA's fraudulent inducement claims is that AIG (primarily through its brokers) misled AXA into believing that the reinsurance facilities operated on a facultative obligatory basis, while AIG treated them as purely facultative and offloaded bad risks onto the reinsurers, and AIG's continuing misrepresentations about the operation of the facilities left AXA off its guard. AIG argues in support of its statute of limitations defense that AXA received numerous documents, some of which AXA signed, that establish that AXA's duty of inquiry arose as early as 1998 and, in any event, no later than September 2000. AXA principally responds that the jury's determination was supported by the "totality of the circumstances,"

---

[3] The parties agree that federal law on inquiry notice is analogous to New York law. *See Armstrong v. McAlpin*, 699 F.2d 79, 86-87 (2d Cir. 1983) (noting that federal and New York law governing "onset periods for [fraud] actions . . . are substantially the same").

specifically that AIG continued to misrepresent the nature of the facilities before, after, and even as the August 1998 wordings were being signed.  We hold that AXA was confronted with a clear "storm warning" in August 1998, as well as additional facts through 2000, "such as to suggest . . . the probability that [it] ha[d] been defrauded," *Guilbert*, 480 F.3d at 147 (internal quotation marks omitted), thereby triggering a duty of inquiry.  AXA's failure to engage in that inquiry imputed to it knowledge of the alleged fraud and renders its fraudulent inducement claims time-barred.

At bottom, AXA fails to adequately address the reality that the August 1998 wordings, which it ultimately signed, clearly indicate that the facilities were facultative in nature, which it even admitted at trial.  *See* J.A. 300-01, 1072 ("REINSURER *may* accept individual risks on a *facultative basis*"), 1085 ("Risks will be evaluated on a *case by case basis*"), 1087 (delineating percentage share of "*each and every facultative risk* set forth in the attached reinsurance agreement") (emphases added); *see also* J.A. 1134, 1146, 1148.  AXA argues that the surrounding circumstances absolve its failure to fully read the wordings and understand that the reinsurance facilities were (at least pursuant to the unambiguous language of the wordings) being operated in a manner that directly contradicted its own expectations.  But had AXA actually read the 1998 wordings, as the law expects, *see, e.g.*, *Staehr*, 547 F.3d at 412 (explaining that we have previously found an investor to be on inquiry notice upon receipt of prospectuses disclosing the character of the investments, and "[t]he fact that the plaintiff failed to read the prospectuses was irrelevant"); *Addeo v. Braver*, 956 F. Supp. 443, 449 (S.D.N.Y. 1997); *cf. Pimpinello v. Swift & Co.*, 253 N.Y. 159, 162-63 (1930) ("If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent;

7

in either case the writing binds him."), AIG's concurrent and future misrepresentations should have only served to heighten AXA's awareness that something was amiss, *see LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155-56 (2d Cir. 2003) (explaining that context determines whether reliance on reassuring statements is reasonable).

AXA cites *Newman v. Warnaco Group, Inc.*, 335 F.3d 187 (2d Cir. 2003), for the proposition that despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management. But in *Newman*, we found that a Form 10-K "'did not contain *any* indication' that the cause of the inefficiency costs was inventory fraud, which was the basis of plaintiff's complaint. It was 'reasonable for Plaintiffs not to inquire' after [a subsequent revised Form 10-K] filing, because Warnaco had provided the 'seemingly benign explanation' that it had revised its financial information to conform to changed accounting methods." *Staehr*, 547 F.3d at 414 (internal citation omitted) (quoting *Newman*, 335 F.3d at 194). By contrast, here, there was a *clear* indication that the reinsurance facilities were being operated as facultative, as stated in the 1998 wordings and admitted by AXA at trial, despite AIG's misrepresentations that the facilities were being operated as facultative obligatory. This is, of course, one of the core bases of AXA's fraud claims. AXA also notes that we have said that "reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty," but AXA omits our proviso that this is so "only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." *LC Capital Partners*, 318 F.3d at 155. Here, AXA could not have reasonably relied on AIG's continued misrepresentations because the law deems it to have been on notice of the language in the 1998 wordings; AXA's failure to carefully read the wordings is legally irrelevant. Moreover, that

8

AXA had constructive notice of the wordings' clear language means that any actions taken by AIG or its brokers to "conceal" the language from AXA would not toll the statute of limitations in this case because the wordings themselves would have given AXA sufficient knowledge to place it under a duty of inquiry. *See, e.g.*, *Rite Aid Corp. v. Grass*, 854 N.Y.S.2d 1, 2 (App. Div. 2008). Thus, the 1998 wordings' language that went to the heart of AXA's factual allegations constituted a storm warning, which AXA was blind to only because it failed to fully read the wordings that it signed, and AXA's claims are time-barred as a result.[4]

Moreover, there were other documented storm warnings up through September 2000 that, under the totality of the circumstances, placed AXA on inquiry notice of the alleged fraud well before December 2, 2003. First, as to AXA's share of the ceded risks, there were, at a minimum, conflicts between representations by AIG and provisions in the underlying documents sufficient to place AXA on notice that its share of the risks may not have been calculated relative only to AIG's share of the risks. *See, e.g.*, J.A. 1393-94 ("Limits and excesses hereon are expressed as 100.00% of original policies" and "Order" listed as "[h]ereon 20.000% of limits and premiums"), J.A. 1084, 1087 (listing AXA's share of the risks as "52.0834% of up to 48% of 100%" where "100% is Defined as 100% of the Entire Risk"), J.A. 1559-78 (Many declarations explaining AXA's share in terms of 52.0834% or 47.1698% of some percentage of 100%). In addition, AXA alleges that, in late 1997, AIG withheld known information about additional losses for the 1997 facility to induce AXA to renew the reinsurance facility for the following

_____

[4] Again, as we recognized in *Staehr*, "'[s]torm warnings' need not detail every aspect of the alleged fraudulent scheme: An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice." 547 F.3d at 427 (internal quotation marks omitted). Accordingly, as detailed below, although there were additional storm warnings related to AXA's other factual allegations, such warnings are not necessary to our finding that AXA was on inquiry notice as early as August 1998.

9

year. As to this allegation, given the additional circumstances and storm warnings, we believe AXA's duty to inquire about the alleged fraud was heightened in September 2000 when AIG disclosed nearly ten times the number of losses that were disclosed in late 1997. Although if this fact stood alone we would likely agree with the District Court's conclusion that a reasonable jury might conclude that AXA "more likely . . . concluded that the losses only became known to AIG later, rather than concluding that AIG had deliberately concealed them," *AXA Versicherung*, 2008 WL 1849312, at *4, we do not believe that a reasonable reinsurer like AXA can continue to turn a blind eye to repeated circumstances indicating that it may be a victim of fraud. Taken together, these events contributed to the duty to inquire under which AXA already operated as a result of its receipt of the 1998 wordings. *See LC Capital Partners*, 318 F.3d at 155. Accordingly, we find that the substantial increase in reported losses for the 1997 facility in September 2000 constituted yet another storm warning, and under the totality of the circumstances, AXA was on inquiry notice of the alleged fraud. AXA's failure to inquire and to act in a reasonably diligent manner imputed to it knowledge of the fraud as early as August 1998, and certainly no later than September 2000.

Accordingly, because we hold that AXA's fraudulent inducement claims are barred by the statute of limitations, we need not reach the issues of whether the case was properly tried before a jury rather than the bench or whether punitive damages were properly awarded. In sum, we affirm the District Court's conclusion that AXA's allegations sound in fraud, but we vacate the judgment holding AIG liable for $34,373,170 because AXA's fraudulent inducement claims are barred by the statute of limitations. We remand to the District Court for entry of judgment in favor of AIG.

FOR THE COURT:<br>
Catherine O'Hagan Wolfe, Clerk of Court